STATE OF MAINE                                              SUPERIOR COURT
ANDROSCOGGIN, ss.                                          CIVIL ACTION
                                                           Docket No. CV-04-168


TOWN OF TURNER,
            Plaintiff

v.                                                  JUDGMENT AFTER TRIAL

WILLIAM C. WHITMAN,
            Defendant


PROCEDURAL HISTORY

On July 30, 2004, the Town of Turner filed a verified complaint against William C. Whitman in the Androscoggin County Superior Court. In its complaint, the Town alleged that Mr. Whitman owned property in Turner, located at 388 Upper Street, and that he was operating an illegal automobile graveyard and/or junkyard at that property. On September 15, 2004, Mr. Whitman filed his answer to the complaint.

The court issued its M.R. Civ. P. 16(a) scheduling order on September 30, 2004. That order required the parties to engage in an alternative dispute resolution process on or before January 20, 2005. On December 9, 2004, representatives for the Town gathered with a mediator to discuss resolution of the case. Despite notice, Mr. Whitman failed to appear for that process. In an order dated May 24, 2005, the court (Delahanty, J.) sanctioned Mr. Whitman by requiring him to pay attorney fees incurred by the Town, and the mediator's fee.

On March 22, 2006, Mr. Whitman and counsel for the Town appeared for trial and presented testimony and argument concerning this case. The discussion, findings, and conclusions below are based upon the evidence submitted at trial, and upon Mr. Whitman's written answer to the Town's complaint.

## DISCUSSSION

According to Mr. Whitman, his family has owned the property located at 388 Upper Street, in the Town of Turner for over 100 years. Mr. Whitman has lived at the property since birth, and expects to remain there until his death. Mr. Whitman testified that he planned to leave the land to the Maine Farmland Trust, to ensure that the property remained in agricultural use. If the land is, in fact, being used for agricultural purposes, Mr. Whitman failed to establish that fact at trial. What the Town established is that the property looks like and is an automobile graveyard and a junkyard.

Over a decade ago, Mr. Whitman began accumulating junked automobiles and other items falling within the definition of "junk" on his property. Based upon the evidence presented, the court determines that this accumulation began in 1993. Plaintiff's exhibit 21. The Town began having problems with Mr. Whitman's collection activities almost immediately thereafter and, for at least the past eleven years, Mr. Whitman has been engaged in a dance with the Town's code enforcement officers concerning his accumulating pile of debris and inoperable motor vehicles. The Record contains a June 21, 1995 letter from the Town's Code Enforcement Officer (CEO), Bob St. Pierre, stating that Mr. Whitman had been notified on two previous occasions that he was in violation of the then-existing "Automobile Graveyard/Junkyard Ordinance" by failing to screen his junk from view. Plaintiff's exhibit 19.

Both Mr. Whitman and the Town's current CEO, Roger Williams, recalled that, at some point, Mr. Whitman's automobile graveyard/junkyard morphed into a continual yard sale. As a result, Mr. Whitman applied for and was granted both a "junkyard permit" and a home occupation permit, with the understanding that he would keep most of the "inventory" screened from view, but would be permitted to display some items on tables set up along the perimeter of the fence. Mr. Whitman applied for a

2

home occupation permit to operate a "secondhand store" on April 24, 1996. His application was granted on July 25, 1996. Plaintiff's exhibit 29.

On January 9, 1997, another CEO, Richard Marble, notified Mr. Whitman that he was in violation of Section 4-A of Turner's Automobile Graveyard/Junkyard Ordinance by failing to obtain a permit. Plaintiff's exhibit 21. Mr. Whitman applied for the permit on January 15, 1997, and was granted it on February 3, 1997. Plaintiff's exhibit 21. On April 2, 1997, CEO Marble sent Mr. Whitman yet another letter. In that letter, CEO Marble told Mr. Whitman that, in order to comply with the junkyard ordinance, he would have to create a junk-free zone around the perimeter of his well. Plaintiff's exhibit 20. The record contains no information to allow the court to determine whether Mr. Whitman complied with that order.

No documents were submitted to show what happened between 1997 and 1998. On March 5, 1998, CEO Marble again wrote to Mr. Whitman, telling him that he was in violation of the "Zoning Ordinance" by failing to provide adequate off-street parking for his home occupation. Plaintiff's exhibit 22. The record does not permit the court to determine what happened next, but on May 18, 1998, CEO Marble wrote to Mr. Whitman and notified him that his July 25, 1996 home occupation permit was withdrawn. In that letter, CEO Marble instructed Mr. Whitman to remove "all material for sale that is piled on [your] property." Plaintiff's exhibit 27.

On the following day, May 19, 1998, CEO Marble delivered a document entitled "Notice of Violation/Order for Corrective Action" to Mr. Whitman. That document told Mr. Whitman that he was in violation of Turner's Auto Graveyard/Junkyard Ordinance, and in violation of 30-A M.R.S.A. §§ 3751-3760. The CEO ordered Mr. Whitman to:

> Remove all material for sale that is piled on [your] property. Also remove all worn out or junked plumbing, heating, household appliances, furniture, [scrapped] or junked lumber, rotten wood, scrap metal, rope, rags, batteries, paper trash, rubber debris or any other waste material or garbage to the area behind the fence on your property where you have a licensed junkyard. Also any automobiles that are not ready for service as evidenced by being registered, inspected and road ready other than 2 vehicles or 2 parts to a vehicle.

Plaintiff's exhibit 23. Although the record contains no documents that would allow the court to determine precisely what occurred next, a January 29, 1999 letter from CEO Pratt to Mr. Whitman contains a summary of those events. Plaintiff's exhibit 28. Mr. Whitman apparently appealed CEO Marble's May 19, 1998 order to the Tuner Board of Appeals. That Board did not act on the appeal, but apparently allowed Mr. Whitman to continue his operation, based upon an agreement reached between Mr. Whitman and CEO Marble. On January 29, 1999, CEO Pratt withdrew Mr. Whitman's home occupation permit, again, based upon his determination that Mr. Whitman had failed to comply with the terms of the agreement he had reached with the previous CEO. Mr. Whitman took no appeal from CEO Pratt's action and, therefore, he has had no home occupation permit since January 29, 1999.

Just over four months later, on June 8, 1999, CEO Kenneth Pratt sent another letter to Mr. Whitman, this time explaining that, after a public hearing held June 7, 1999, Turner's Selectmen had voted to revoke his junkyard permit as of June 7, 1999. CEO Pratt notified Mr. Whitman that he was to "remove all materials associated with [his] Junkyard by July 9, 1999." Plaintiff's exhibit 24.

With this final letter, Mr. Whitman's on-going enterprises should have ended. The Town had finally revoked both of Mr. Whitman's permits to operate either an automobile graveyard/junkyard and/or a home occupation on his property. Despite those revocations, however, Mr. Whitman took no steps to clean up his property and,

4

until very recently, the Town did not take the steps necessary to enforce its ordinances or the orders of its CEOs. Although the court appreciates that all towns, including Turner, wish to resolve issues without initiating costly litigation, delay helps neither party when the problem presented is as large, and the property owner as intransigent, as this one. Based upon the evidence presented, including Mr. Whitman's own testimony, the court must conclude that Mr. Whitman has continued to accumulate junk and debris since 1999. As a result, he—and perhaps the Town—will be faced with a much larger clean up project in 2006 than either would have faced in 1999.

In 2003, the Town began its most recent attempt to convince Mr. Whitman to bring his property into compliance. On May 7, 2003, CEO Roger Williams sent a Notice of Violations and Order to Correct to Mr. Whitman. Plaintiff's exhibit 8. In that Notice, CEO Williams told Mr. Whitman that he was operating an automobile graveyard/junkyard without the required permit, and ordered him to clean up the property within thirty (30) days. CEO Williams notified Mr. Whitman that he had the right to appeal his decision to the Superior Court.[1] Mr. Whitman did not do so.

On June 2, 2003, CEO Williams wrote a letter to Mr. Whitman, explaining that the Selectmen would be reviewing his property on June 16, 2003. Plaintiff's exhibit 9. On June 11 CEO Williams wrote to Mr. Whitman again, this time referring to the 1996 home occupation permit, apparently not realizing that the permit had been revoked in 1999. CEO Williams also warned Mr. Whitman to clean up the property. Plaintiff's exhibit 10. CEO Williams wrote a third time on July 4, 2003, and stated that he would

---

[1] The version of Turner's Ordinance that became effective on April 5, 2003 provides that parties aggrieved by a decision of the CEO may appeal to the Board of Appeals within thirty (30) days of the date of the decision. Ordinance § 7(C)(1).

grant Mr. Whitman an additional thirty (30) days to come into compliance. Plaintiff's exhibit 11. Then the Town took no action for four months.

On November 10, 2003, CEO Williams issued a second Notice of Violation and Order to Correct to Mr. Whitman. Plaintiff's 13. On December 11, 2003, Mr. Whitman filed an application to appeal to the Board of Appeals from the CEO's November 10, 2003 decision. Plaintiff's exhibit 31. Mr. Whitman attached an eleven-page statement to that application, explaining his version of events. Although his appeal was not timely filed, the Board apparently heard it on January 6, 2004, and upheld the CEO's decision. Plaintiff's exhibit 14A. Mr. Whitman did not file an appeal from this decision with the Superior Court. The Selectmen then gave Mr. Whitman until May 15, 2004, to bring his property into compliance. Plaintiff's exhibit 14A. The evidence presented at trial clearly shows that Mr. Whitman has failed to comply with that deadline.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.     Title 30-A M.R.S.A. § 3753 mandates that any person who wishes to establish, operate or maintain an automobile graveyard or junkyard must first obtain a nontransferable permit from the municipal officers of the municipality in which the automobile graveyard or junkyard is to be located.

2.     In 2003, when the Town began the enforcement actions that would give rise to this case, Turner's Zoning Ordinance, as amended April 5, 2003, and admitted into evidence as plaintiff's exhibit 2A, (hereinafter "Ordinance"), did not permit automobile graveyards or junkyards in Rural 2 Districts.

3.     Section 8 of the Ordinance defines an automobile graveyard as: "A place where three or more unregistered, unserviceable, discarded, worn-out or junked automotive vehicles, or bodies, or engines thereof are gathered together and may include the sale of used vehicles." Plaintiff's exhibit 2A.

5. Section 4 of the Town's Automobile Graveyard and Junkyard Ordinance defines an automobile graveyard as: "A yard, field or other area used as a place of storage . . . for three (3) or more unserviceable, discarded, worn out or junked motor vehicles as defined in Title 29-A MRSA, Section 101, subsection 42, or parts of such vehicles." Plaintiff's exhibit 3A.

6. Section 8 of the Ordinance defines a junkyard as:

A visible yard, field or other area used as [a] place for storage and/or sale of the following:

1. discarded, worn-out or junked plumbing, heating supplies, household appliances and furniture;
2. discarded, scrap and junked lumber; and
3. old or scrap copper, brass, rope, rags, batteries, paper trash, rubber or plastic debris, waste and all scrap iron, steel and other scrap ferrous or non-ferrous material.

Plaintiff's exhibit 2A.

7. Section 4 of the Town's Automobile Graveyard and Junkyard Ordinance defines a junkyard as: "A yard, field or other area used to store discarded, worn out or junked plumbing, heating supplies, household appliances or furniture, scraped or junked lumber, rotten wood, scrap metal, rope, rags, batteries, paper trash, rubber debris or any waste material, garbage dumps, waste dumps, and sanitary fills." Plaintiff's exhibit 3A.

8. Mr. Whitman's property is located in a Rural 2 District.

9. In 2003, Mr. Whitman did not have a permit to operate either an automobile graveyard/junkyard or a home occupation on his property.

10. Based upon the testimony of Roger Williams and upon the photographs admitted into evidence, the court finds that, since May of 2003, there have been three or more unregistered, unserviceable, discarded, worn-out or junked automotive vehicles, or bodies, or engines thereof on Mr. Whitman's property.

7

11.     During his testimony at trial, Mr. Whitman confirmed that there are actually twenty-two unusable vehicles on his property.

12.     Based upon these findings, the court concludes that Mr. Whitman has maintained an automobile graveyard on his property, in violation of the Town's Ordinances, and in violation of 30-A M.R.S.A. § 3753, since May of 2003.

13.     Based upon the testimony of Roger Williams and upon the photographs admitted into evidence, the court further finds that, since May of 2003, a growing portion of Mr. Whitman's property has been filled with discarded, worn-out or junked household appliances and furniture, and discarded, scrap and junked lumber.[2]

14.     Based upon these findings, the court concludes that Mr. Whitman has maintained a junkyard on his property, in violation of the Town's Ordinances and 30-A M.R.S.A. § 3753, since May of 2003.

15.     Based upon the testimony of Roger Williams and upon the photographs admitted into evidence, the court finds that both the automobile graveyard and the junkyard were still in existence as of February 21, 2006.

16.     Based upon the testimony of Roger Williams and upon the documents admitted into evidence, the court finds that, in May of 2003 and again in November of 2003, Mr. Whitman received Notices of Violation sent to him by the Town.

17.     Mr. Whitman filed an appeal from the Notice dated November 10, 2003, with the Turner Board of Appeals. Plaintiff's exhibit 31. The Board denied his appeal on or about January 6, 2004.

---

[2]  As noted above, the Town's general Ordinance includes the word "visible" in its definition of a junkyard. However, the element of visibility is not found in either the Town's specific junkyard ordinance, or in the statutory definition of a junkyard. 30-A M.R.S.A. § 3752(4).

18.     Despite losing his appeal, Mr. Whitman has not cleared the unserviceable motor vehicles or other debris[3] from his property.

19.     As of March 22, 2006, the date of trial, Mr. Whitman had been in violation of the November 10, 2003 notice for 859 days. Although the court recognizes that Mr. Whitman has actually been in violation for a far longer period, the court concludes that it must determine the period of violation based upon the November 10, 2003 Notice of Violation because Mr. Whitman was given misinformation about his appeal rights concerning the May 2003 Notice.

20.     Mr. Whitman testified that he has a use or a planned use for every item on the property. The court does not find that statement credible. Even if the court found that statement credible, however, Mr. Whitman's plan to use the items does not prevent the court from finding that an automobile graveyard and a junkyard exist on the property. In *Town of Pownal v. Emerson*, the Law Court explained: "a landowner who stores material that meets the objective definition of the statute cannot avoid liability because he plans eventually to use the material." 639 A.2d 619, p. 621 (Me. 1994).

21.     Mr. Whitman has also challenged the Town's actions, calling its enforcement of the ordinances an attempt to impose "Martha Stewart" standards on him and other long-time residents. At the risk of pointing out to Mr. Whitman what he already knows, the ordinance was adopted by the citizens of Turner. The State statutes concerning automobile graveyards and junkyards were enacted by the members of Maine's legislature, all of whom are Maine citizens and residents. Ms. Stewart may own property in Maine, but there is no evidence that she participated in any of Turner's

---

[3] "Debris" is defined as "fragments, litter left after a smash; rubbish." by WEBSTER'S NEW AMERICAN DICTIONARY 256 (1961); alternately it is defined as "scattered broken pieces" according to the OXFORD AMERICAN DICTIONARY 163 (1980). Contrary to Mr. Whitman's assertions at trial, "debris" accurately describes the vast majority of items located on his property.

own meetings; nor is there evidence that she participated in any legislative proceedings. Mr. Whitman must face up to the fact that the Town's ordinances and the State's laws apply to him, whether or not he agrees with them.

Based upon the findings and conclusions above, the court issues the following ORDERS:

A.  Mr. Whitman shall immediately cease and desist in his continuing operation and/or maintenance of an automobile graveyard and/or junkyard on his property.

B.  Within 120 days from the date of this Order, Mr. Whitman shall remove all but two (2) unregistered and/or unserviceable motor vehicles from the property.

C.  Within 120 days from the date of this Order, Mr. Whitman shall remove all of the discarded, worn-out or junked household appliances and furniture, and all of the discarded, scrap and junked lumber located on his property. Some of these items can be seen in the photographs admitted into evidence as plaintiff's exhibits.

D.  Mr. Whitman shall pay civil penalties to the Town, pursuant to 30-A M.R.S.A. § 4452(3)(B) in the amount of $85,900, execution to issue forthwith. This figure represents the minimum fine that could be imposed by the court, $100 per day, for every day since November 10, 2003. The accumulation of fines will be tolled during the next 120 days while Mr. Whitman complies with this Order. Should he fail to comply, however, the ultimate fine imposed will include $100 for each of those days.

E.  Within 120 days from the date of this Order Mr. Whitman shall pay $3,548.91 to the Town, pursuant to 30-A M.R.S.A. §§ 3758 and 4452(3), towards the Town's reasonable attorney fees, execution to issue forthwith.

10

F.  This Order is binding upon Mr. Whitman's heirs, assigns, and successors, and shall be a covenant in writing with the land. This Order may be recorded in the Androscoggin County Registry of Deeds.

G.  If Mr. Whitman fails to comply with the court's orders, he may face additional sanctions.

Pursuant to 30-A M.R.S.A. § 3758-A(4), if Mr. Whitman does not complete the ordered correction or abatement in accordance with the ordered schedule, the municipal officers or their designated agent may enter the property and may act to abate the site in compliance with the order. To recover any actual and direct expenses incurred by the municipality in the abatement of the nuisance, the municipality may: (1) File a civil action against Mr. Whitman to recover the cost of abatement, including the expense of court costs and reasonable attorney's fees necessary to file and conduct the action; (2) file a lien on Mr. Whitman's property; or (3) assess a special tax on the property. The clerk is instructed to incorporate this order by reference in the docket for this case.

DATED: March 29, 2006

_____
Ellen A. Gorman
Justice, Maine Superior Court

11